IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:17-CV-223-FL

| | | |
|---|---|---|
| EDGE-WORKS MANUFACTURING COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| HSG, LLC, | ) ) | |
| Defendant. | ) ) ) | |

This matter is before the court on plaintiff's motion for preliminary injunction. (DE 7). The issues raised have been briefed fully and in this posture are ripe for adjudication. For the reasons that follow, plaintiff's motion for preliminary injunction is denied.[1]

## STATEMENT OF THE CASE

Plaintiff initiated this case by complaint filed November 22, 2017, alleging that defendant's variable compression ammunition magazine pouches, known as the Polymer Taco pouches ("accused products"), infringe upon U.S. Patent No. 9,795,210 ("the '210 patent").[2] Plaintiff was granted this patent in conjunction with the development of its own variable compression ammunition

---

[1] Plaintiff's motion, as originally filed, was an emergency motion for temporary restraining order and preliminary injunction. (DE 7). On December 14, 2017, the court denied plaintiff's motion as to its request for temporary restraining order.

[2] The parties are also before this court in HSG, LLC v. Edge-Works Manufacturing Company, et al, 7:17-CV-29-FL, in which HSG, LLC ("HSG") alleges in part that Edge-Works Manufacturing Company ("Edge-Works") has breached a settlement agreement previously entered into by the parties. In the instant case, following notice of related case filed by HSG and at the direction of this court, this case was reassigned to the undersigned district judge on December 5, 2017.

magazine pouches, known as the Hardshell Scorpion pouches.[3]

Plaintiff filed the instant motion on December 1, 2017, seeking an order prohibiting defendant from further sales of its accused products.  In support of the motion, plaintiff submitted an affidavit of Scott Evans, president of Edge-Works; articles from Defense Review and Soldier Systems, mailers for the softshell and hardshell Scorpion pouches, U.S. Patent Application No. 14/881,081; U.S. Patent No. 9,668,568; U.S. Patent Application No. 15/611,922; U.S. Patent No. 9,795,210; printouts of HSG's website; Soldier Systems' advertisement of the Polymer Taco; Shot Show Advertisement; November 10, 2017 letter from Edge-Works to HSG; declaration of Christina Chamberlain, patent attorney; and a claims chart.

On December 14, 2017, the court held a telephonic conference with the parties and, following the conference, entered an order denying plaintiff's motion as to its request for temporary restraining order and directing defendant to file a response to plaintiff's motion for preliminary injunction by December 18, 2017.  Defendant filed a timely response and submitted in support of its response the following: manually-filed nylon and polymer Taco pouches; December 1-3, 2017 email exchange between the parties; declaration of Matthew J. Gadams, managing member of HSG; U.S. Patent No. 9,759,536; article from Soldier Systems; declaration of Frederick W. Storms, Jr., director of research and development at HSG; declaration of Darrell A. Fruth, attorney; dictionary definition of "covered"; and various prosecution history records.

After receiving leave to file a reply to defendant's response in excess of 10 pages, plaintiff submitted reply to defendant's response on December 29, 2017.  In support of its reply, plaintiff offered supplemental declaration of Scott Evans; confirmatory patent assignment; filing receipt of

---

[3]  Plaintiff also refer to these pouches as "carriers."

confirmatory patent assignment at the Patent and Trademark Office ("PTO"); declaration of Stephen Kepper, attorney; dictionary definition of "cover"; U.S. Patent No. 3,053,005; U.S. Patent Application No. 14/770,855; and various prosecution history records.

## STATEMENT OF FACTS

Plaintiff and defendant both manufacture and sell tactical gear, including ammunition magazine pouches, marketed to people serving in the military, law enforcement, and individual consumers.

In 2014, plaintiff released its line of Hardshell Scorpion pouches. Additionally, on October 13, 2014, plaintiff filed provisional patent application 62/063,133 ("the '133 application").[4] On October 12, 2015, plaintiff filed non-provisional application 14/881,081("the '081 application").[5] This non-provisional application matured into U.S. Patent No. 9,668,568 ("the '568 patent") on June 6, 2017. Both the '081 application and '568 patent are entitled "expandable carry pouch with variable compression" and include Figure 3 reproduced below in conjunction with the '210 patent.

While the '081 application was pending, plaintiff filed a continuation application 15/611,922 (the '922 application")[6] of the '081 application on June 2, 2017.[7] This continuation application

---

[4] A provisional application is a legal document filed with the PTO that can establish an early filing date for a patent but does not mature into an issued patent unless the applicant files a regular non-provisional patent application within one year.

[5] The publication number for this application is 2016/010,0678.

[6] The publication number for this application is 2017/027,3445.

[7] Regarding a continuation application, "[a]lthough there may be some variation in the scope of claimed subject matter, a continuation application is based solely on the disclosure of a parent application. By definition, a continuation adds no new matter and is akin to an amendment of a pending application." Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc., 98 F.3d 1563 (Fed. Cir. 1996) (Mayer, J., concurring) (citations omitted). It appears that plaintiff incorrectly described this continuation application as a continuation-in-part application, which does introduce new matter, in its memorandum in support of the instant motion, (see DE 8 at 7), but then clarified in its reply that this application is a continuation application, not a continuation-in-part application, (see DE 30 at 5).

matured into the instant patent at issue, the '210 patent, on October 24, 2017.

Claim 1 of the '210 patent describes:[8]

1. An expandable carry carrier defining an interior compartment defined by

    a. a front wall with an interior and exterior surface with apertures along a perimeter of the front wall;

    b. a back wall opposed to the front wall with an interior and exterior surface with apertures along a perimeter of the back wall;

    c. a pair of opposing side walls;

    d. at least one <u>covered</u> recessed vertical channel molded into the interior surface of the front or back wall between the apertures along the perimeter of the front or back wall extending longitudinally along the length of the front or back wall with <u>openings on opposite ends</u> and molded into the front wall or back wall; and

    e. a top open end;

wherein the front wall and back wall are compressed towards one another using a binding device weaved or laced through the apertures in the perimeter of the front and back wall and the recessed vertical channel and the openings of the vertical channel.

('210 patent (DE 8-9) col. 4 ll. 28-47 (emphasis added)).

---

[8] Plaintiff briefly argues in a footnote in the instant motion that defendant has infringed multiple claims of the '210 patent. (<u>See</u> DE 8 at 16 n.6). However, plaintiff and defendant focus their substantive arguments solely on independent claim 1. Therefore, the court only addresses claim 1 of the '210 patent.

As stated above, the '210 patent contains a limitation for "at least one covered recessed vertical channel . . . with openings on opposite ends." In Figure 3 found below of the '210 patent the notation "70" is used to identify vertical channels.



FIG. 3

(Id. at Figure 3).

In 2009 defendant released its line of Taco ammunition magazine pouch products made primarily of nylon fabric. On or around November 6, 2017, defendant introduced its accused products, the Polymer Taco pouches, which plaintiff alleges infringes its '210 patent. Below are images of the front and back of one of defendant's accused products:

Front                                                                       Back

 

## COURT'S DISCUSSION

A.     Standard of Review

The grant or denial of a motion for preliminary injunction in the context of patent infringement litigation is in the discretion of the district court. See 35 U.S.C. § 283. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief . . . ." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. Although no single factor is dispositive as to the issuance of a preliminary injunction, "a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239

F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original).[9]

In order to establish a likelihood of success on the merits, plaintiff must show, in light of the presumptions and burdens that will inhere at trial, that 1) plaintiff will likely prove that defendant infringed the '210 patent, and 2) the infringement claim will likely survive any challenges by defendant to the validity and enforceability of the '210 patent. See Genentech, Inc. v. Novo Nordisk, 108 F.3d 1361, 1364 (Fed. Cir.1997). An accused infringer "can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of validity or infringement." Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014).

Infringement entails a two-step analysis. First, the court must determine the meaning and scope of the patent claims asserted to be infringed. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir.1995). This first step is commonly called claims construction. Id. Second, the asserted infringed claim "as properly construed must be compared to the accused device or process." Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1302 (Fed. Cir.1997).

"Claim construction seeks to ascribe the ordinary and customary meaning to claim terms as a person of ordinary skill in the art would have understood them at the time of invention." MasterMine Software, Inc. v. Microsoft Corp., 874 F.3d 1307, 1310 (Fed. Cir. 2017) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc)). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. (citing Phillips, 415 F. 3d at 1314). In addition, "the person of ordinary skill in the art is deemed to read the claim term

---

[9] When deciding a preliminary injunction motion in a patent infringement action, the analysis is subject to the law of the regional circuit in which the district court sits, but Federal Circuit precedent controls on all patent-specific issues. See Murata Mach. USA v. Daifuku Co., 830 F.3d 1357, 1363 (Fed. Cir. 2016) ("However, the Federal Circuit has itself built a body of precedent applying the general preliminary injunction considerations to a large number of factually variant patent cases, and gives dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues.").

not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. (citing Phillips, 415 F. 3d at 1313). But "[w]hile we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims." Id. (citing Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1371 (Fed. Cir. 2014)).

While the specification is the principal source of the meaning of a disputed term, the prosecution history may also be relevant. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Phillips, 415 F.3d at 1317 (citation omitted).[10]

In the second step of the infringement analysis, the properly construed patent claims are compared to the allegedly infringing product. In order to show infringement, plaintiffs must show that each element of the patent claims is present in the accused device either literally or under the doctrine of equivalents. See Catalina Marketing Int'l v. Coolsavings.com, 289 F.3d 801, 812 (Fed. Cir. 2002). "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system." TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1361

---

[10] Although the court on motion for preliminary injunction must assess the likelihood of plaintiff proving infringement, the court has no obligation to interpret the patent claims "conclusively and finally during a preliminary injunction proceeding." Sofamor Danek Group, Inc. v. DePuy–Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir.1996). Instead, the court may make the determination of likelihood of success on the merits based on a tentative claims construction and "exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." Id.; see also International Communication Materials v. Ricoh Co., 108 F.3d 316, 318–19 (Fed. Cir.1997) (affirming district court's denial of preliminary injunction and holding that proper role of appellate court was to allow the district court and the parties the opportunity to completely and conclusively interpret the patent claims); Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1345 n.3 (holding that a district court can issue "tentative" or "rolling" claim constructions when "faced with construing highly technical claim language on an expedited basis, such as in a preliminary injunction proceeding") (internal quotations omitted).

(Fed. Cir. 2002). In order to establish infringement under the doctrine of equivalents, plaintiffs must show that any differences between the accused product and the patent claims are insubstantial. See Mas–Hamilton Group v. LaGard Inc., 156 F.3d 1206, 1212 (Fed. Cir.1998).

B.    Analysis

1.    Effective Filing Date

Preliminarily, the court must resolve the dispute between the parties as to the effective filing date of the '210 patent to identify the scope of potentially invalidating prior art. The effective filing date is the "filing date of the earliest application for which the patent or application is entitled . . . to a right of priority." 35 U.S.C. § 100(i). A patent's effective filing date, the "priority date," is usually the date on which the patent application is filed with the PTO, unless the patentee claims the benefit of an earlier-filed application. See, e.g., Cordis Corp. v. Boston Scientific Corp., 561 F.3d 1319, 1331–32 (Fed. Cir. 2009). "Determination of a priority date is purely a question of law if the facts underlying that determination are undisputed." Bradford Co. v. Conteyor N. Am., Inc., 603 F.3d 1262, 1268 (Fed. Cir. 2010) (citation omitted).

The patent application for the '210 patent states as the first sentence in its specification that that it is a continuation of the '081 application, filed on October 12, 2015 and that the '081 application claims the benefit of the '133 application filed October 13, 2014. (DE 8-8 at 8).[11] However, on the application data sheet ("ADS") submitted in conjunction with a patent application, plaintiff states only that the application is a continuation of the '081 application with no reference to the '133 application. (DE 24-5 at 3).

35 U.S.C. § 120 allows a later filed patent application to claim the benefit of an earlier filing

---

[11] This sentence, which also references provisional application number 62/190,025, filed July 18, 2015, is found both in the patent application for the '210 patent and the '210 patent itself. (See DE 8-8 and DE 8-9).

date in the United States if, among other requirements, "it contains or is amended to contain a specific reference to the earlier filed application . . . submitted at such time during the pendency of the application as required by the Director." 35 U.S.C. § 120; <u>Medtronic CoreValve, LLC v. Edwards Lifesciences Corp.</u>, 741 F.3d 1359, 1363 (Fed. Cir. 2014) (stating the court recently "clarified that the 'specific reference' requirement mandates 'each [intermediate] application in the chain of priority to refer to the prior applications.'") (citation omitted). Additionally, the PTO has promulgated regulations to specify the procedures for claiming priority under § 120, including that "[a]ny nonprovisional application . . . that claims the benefit of one or more prior-filed provisional applications must contain . . . a reference to each such prior-filed provisional application, identifying it by the provisional application number (consisting of series code and serial number). If the later-filed application is a nonprovisional application, the reference required by this paragraph <u>must be included in the application data sheet</u>." 37 C.F.R. § 1.78(a)(3) (emphasis added).[12] Additionally, 37 C.F.R. § 1.76(b)(5) states that the references to be provided on the ADS "constitutes the specific reference required by 35 U.S.C. [120] and § 1.78."[13]

Here, plaintiff seeks to stack effective filing dates, arguing that because the '210 patent and related ADS contain specific references to the '081 application and because the '081 application contains a specific reference to the '133 application, the '210 patent application has effective filing

---

[12] The application at issue, the '922 application, is a continuation of the '081 application, a non-provisional application.

[13] Under former regulations, reference in the first sentence of the patent specification to prior patent applications was sufficient to claim priority, but those regulations were revised effective September 16, 2012. <u>See</u> <u>Manual of Patent Examination Practice</u> § 211.02 (9th Ed. 2015) ("For applications filed on or after September 16, 2012, the specific reference to the prior application must be included in an application data sheet (37 CFR 1.76). For applications filed prior to September 16, 2012, the specific reference to the prior application must be in an application data sheet (37 CFR 1.76(a)) and/or in the first sentence(s) of the specification following the title, although the Office prefers the use of an application data sheet."); <u>see also</u> <u>E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols., L.L.C.</u>, 525 F.3d 1353, 1360-61 (Fed. Cir. 2008) (applying former regulations).

date of October 13, 2014, the filing date of the '133 application. However, this proposal runs afoul of the language of 37 C.F.R. § 1.78(a)(3), a regulation plaintiff does not address, which requires reference to the '133 application to be included in the ADS to the application for the '210 patent. Therefore, the effective filing date for the '210 patent is October 12, 2015, the date plaintiff filed the '081 application.

> ### 2. Likelihood of Success on the Merits

> #### a. Likely Infringement of the '210 Patent

The court now turns to whether plaintiff has shown that the accused products likely infringe plaintiff's '210 patent. Step one of such an analysis requires the court to determine the meaning and scope of the claims of the '210 patent. Here, the only claims construction dispute between the parties concerns the meaning of the word "covered" as found in claim 1 of the '210 patent which requires "at least one covered recessed vertical channel molded into the interior surface of the front or back wall . . .". ('210 patent (DE 8-9) col. 4 ll. 36-37).

Plaintiff asserts, as it does with all of the terms of the patent, that the ordinary meaning of the term should control and that the ordinary meaning of "cover" is to "put something on top of or in front of (something) in order to protect or conceal it." (DE 30 at 4 (citing the Oxford Online English Dictionary)). Defendant argues that in this case "covered" means "fully enclosed" in that the molded channels at issue should be covered when viewed from either the outside or from the inside of the product. (DE 21 at 13 ("A person skilled in the art would therefore understand a 'covered' recessed channel molded into the interior surface of a pouch to create an enclosed passage or tunnel, through which a bungee cord can be laced.")).

Defendant's construction is not supported by the ordinary meaning of the terms of claim 1,

the specification, or the prosecution history. Nowhere in the patent claims is the term "covered" defined, nor are the words "cover" or "covered" as applied to the channel at issue referenced in the specification. However, claim 1's requirement of "at least one covered recessed vertical channel" by its terms does not indicate that such a channel must be "fully enclosed," a phrase inconsistent with the ordinarily understood meaning of the term "covered." The figures in the specification further support this construction. The figures, represented by Figure 3 included above, do not illustrate an enclosed passage or tunnel through which a bungee cord can be laced. The figures only represent a channel that is covered when viewed from the outside.

Additionally, as both parties recognize, the parent application to the '210 patent described a "vertical channel" without the limitation of being "covered," which was rejected by the PTO as anticipated by U.S. Patent No. 3,053,005 which disclosed an uncovered channel. (See DE 24-1 at 1; DE 24-2 at 6). Thereafter, plaintiff added "covered" to claim 1, which remained in claim 1 of the '210 patent as issued, but there is no indication in the prosecution history that "covered" was inserted to mean "enclosed." (See DE 24-3). The court agrees with plaintiff, as does defendant, that an "uncovered channel" would not literally infringe the '210 patent; however, that does not mean "covered" should be construed to mean "enclosed" where such a reading is not supported by the claims, specification, or prosecution history.[14]

Accordingly, for the purposes of deciding the present motion, the court adopts plaintiff's definition that "covered" means to "put something on top of or in front of (something) in order to

---

[14] Defendant argues that the prosecution history indicates that plaintiff in some way surrendered claim scope regarding the term "covered," as recognized by the doctrine of prosecution disclaimer. (See DE 21 at 11). However, defendant has not offered, nor has the court found, any action or statement indicating disclaimer. See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325–26 (Fed. Cir. 2003) ("for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable").

protect or conceal it," as illustrated in the specification figures of the '210 patent.

Because no other terms are in dispute, the court now compares claim 1 of the '210 patent to defendant's accused products. Defendant argues that its accused products do not infringe the '210 patent because 1) the accused products do not contain a "covered recessed vertical channel molded into the interior" of its front or back walls 2) with "openings on opposite ends."

The patent requires "at least one covered recessed vertical channel" in which the "channel" is described as:

1)     molded into the interior surface of the front or back wall

2)     between the apertures

3)     along the perimeter of the front or back wall[15]

4)     extending longitudinally along the length of the front or back wall

5)     with <u>openings on opposite ends</u>

6)     and molded into the front wall or back wall

7)     . . .wherein the front wall and back wall are compressed towards one another using a binding device weaved or laced through the apertures in the perimeter of the front and back wall and the recessed vertical channel and the <u>openings of the vertical channel</u>."

('210 patent (DE 8-9) col. 4 ll. 36-47)(emphasis added)).

Turning to the front of the accused products first and using the term "covered" as construed by the court above, there are two vertical channels which are covered but do not have openings on

---

[15]  Arguably, two and three above could be combined to form one description of the channel; however, the specification supports the reading that two and three are separate channel descriptions. (<u>See</u> '210 patent (DE 8-9) col. 3 ll. 11-13)("The present invention further comprises at least one vertical channel 70 along the perimeter of the front wall . . .")).

opposite ends. Although plaintiff argues there are a multiplicity of channels extending from the two main vertical channels to the center that do have openings into the vertical channels and the center, those channels are not vertical, are not along the perimeter of the front or back walls, and do not extend longitudinally along the length of the wall and are therefore not "covered recessed vertical channel molded into the interior" of the products' front or back walls with "openings on opposite ends," as specifically required by claim 1.

Turning to the back of the accused products, however, there are two covered recessed vertical channels that fit all of the requirements above. Although defendant argues that these openings are not openings to "vertical channels" but are openings to a "product-wide recess," (DE 21 at 15), the court finds that these "recesses" satisfies all of the above descriptions of a "vertical channel" with "openings on opposite ends" and provide a way "wherein the front wall and back wall are compressed towards one another using a binding device weaved or laced through the apertures in the perimeter of the front and back wall and the recessed vertical channel and the openings of the vertical channel." ('210 patent (DE 8-9) col. 4 ll. 36-47). As indicated by the specification, the "channels" described by the patent can be of various shapes and sizes, as found on the back of defendant's accused products. (See id. col. 3 ll. 31-32 ("[t]he vertical channels 70 and at least one horizontal channel 80 aid in retaining the binding device"); Figure 3 (depicting vertical channels 70 and horizontal channel 80)).

In sum, plaintiff has forecasted sufficient evidence to show it will likely prove that defendant's accused products infringe the '210 patent.[16]

---

[16] The court rejects defendant's argument that plaintiff has failed to show that the accused products are likely to infringe the '210 patent in that the claims chart submitted by plaintiff was materially incomplete and that plaintiff's materially defective claims chart renders the record insufficient. Plaintiff correctly asserts that it proposed that all terms be construed according to their normal meaning and that plaintiff's motion could have been made without submission

b.      Challenges to Enforcement and Validity of '210 Patent

A preliminary injunction should not issue if the accused infringer "raises a substantial question concerning either infringement or validity." Amazon.com, 239 F.3d at 1350. Here, defendant argues the '210 patent is invalid as anticipated by defendant's nylon Taco products, for obviousness, and for indefiniteness. The court will address each argument in turn below.

i.      Anticipation

"[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir.1998). Defendant argues that three of defendant's nylon Taco products anticipate, and thereby render invalid, the '210 patent. Pictures of these products are reproduced below:

  

(DE 21 at 5, 18-19).

The nylon Taco products fail to disclose "recessed vertical channels molded into the interior

---

of any claims chart. (DE 8 at 14-16; DE 30 at 3 n.2). Notwithstanding the substantial inaccuracies of plaintiff's submitted claims chart, the court notes plaintiff accurately quoted in full claim 1 of the '210 patent in its memorandum in support of its motion. (See DE 8 at 7).

surface of the front or back walls" as required by the '210 patent.  Although defendant argues that this requirement has been met in that the nylon Taco products have such channels molded out of nylon rather than plastic, defendant does not explain, nor can the court discern, how these products, which are comprised of pieces of nylon fabric loops sewed to the exterior of the front and back walls, can be considered "channels," "recessed," or "molded into the interior surface of the walls."[17] Accordingly, defendant has failed to raise a substantial question that the '210 patent is invalid as anticipated by defendant's nylon Taco products.[18]

### ii.    Obviousness

A claim is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103.  The obviousness inquiry entails consideration of whether a person of ordinary skill in the art "would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success in doing so." Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (internal citation omitted).  In determining whether there would have been a motivation

---

[17] Defendant argues that even though the "original Taco is molded from nylon rather from the polymers used to mold the Accused Products," such a distinction is irrelevant, citing to statements made by the patent examiner.  (DE 21 at 18; see DE 24-2 at 6 (stating that regarding the openings and apertures being "molded," "the method of forming the device is not germane to the issue of patentability of the device itself and therefore, this limitation has not been given patentable weight")).  It is unclear if defendant is arguing that its accused products need not be "molded" at all.  If so and if true, defendant still has not explained how its nylon Taco products have "channels" that are "recessed."

[18] Defendant asserts that plaintiff never identified the nylon Taco products as prior art for the patent examiner to consider.  (See DE 21 at 19).  Although the court cannot currently determine whether plaintiff had such an obligation or failed in that obligation, the court notes on the front page of the '210 patent, under the heading "References Cited" a list of all of the prior art identified by the patent examiner is found, including defendant's U.S. Application No. 14/770,855, published as no. 2016/0003598.  (See '210 patent (DE 8-9) at 1; DE 30-8). This patent application contains descriptions and drawings of defendant's nylon Taco products, indicating the examiner was aware of these products.  (See DE 30-8).

to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason why a person of skill in the art would have made the combination.  See In re Van Os, 844 F.3d 1359, 1361 (Fed. Cir. 2017).

 Defendant relies on two separate publications dated September 10, 2014 and September 11, 2014 as prior art for rending the '210 patent invalid for obviousness.  In order for these publications to be considered prior art under the Patent Act, they must be published more than one year before the earliest effective filing date of the '210 Patent.  35 U.S.C. 102(b).  Because the court has determined that the effective filing date for the '210 patent is October 12, 2015, the publications cited by defendant are to be considered prior art for the purposes of this obviousness analysis.

The two publications cited by defendant were published by plaintiff on its Facebook page and on the website called Soldier Systems under "Sneak Peak," and contain pictures of radio pouches designed by plaintiff which defendant argues disclose plaintiff's design for recessed channels molded into the face of an expandable tactical gear pouch.  (DE 21 at 19-21).  An example of one such picture is reproduced below:



(DE 21 at 20).

After offering the above publications, defendant states "[a]s explained in the Declaration of Mr. Storms, it would have been obvious, given the state of the art at the time, to combine the vertical channels disclosed by [plaintiff] . . . with the channels and walls in the well-established Taco pouch products." (Id. at 21). Turning to the referenced declaration, Storms, the director of research and development for defendant, states without elaboration that "[i]t would have been obvious, given the state of the art at the relevant time in 2014, to use a molded plastic material for a front face with vertical channels disclosed in the Edge-Works Facebook post and Soldier System Sneak Peak and incorporate this approach into the well-established Taco pouch products." (DE 23 at 12). Defendant then states, again without elaboration, that such a combination "would clearly meet every limitation of Claim 1 in the '210 patent." (DE 21 at 21).

Defendant offers no reason why a person of ordinary skill in the art would have been motivated to combine the prior art referenced, would have had a reasonable expectation of success in doing so, or how such a combination would meet every limitation of claim 1 of the '210 patent.

See Metalcraft of Mayville, Inc. v. The Toro Co., 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("We agree with the district court that Toro provides no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention"). Defendant's conclusory assertion that "it would have been obvious" to a person having ordinary skill in the art to combine plaintiff's design with defendant's Taco pouch products is insufficient to carry defendant's burden to raise a substantial question that the '210 patent is invalid as obvious.

### iii. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Tinnus Enterprises, LLC v. Telebrands Corp., 846 F.3d 1190, 1205 (Fed. Cir. 2017) (citing Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014)).

Defendant argues that because the specification "never mentions the word 'covered,'" this lack renders any claim for a "covered" vertical channel indefinite. (DE 21 at 22 ("Any claim for a 'covered' vertical channel that reads on the Accused Products, which have no 'cover' in any ordinary sense of the word, would be indefinite because someone skilled in the art would not understand 'covered' to mean 'no covered.'")). Plaintiff, however, directs the court's attention to the prosecution history, arguing that this issue has been previously and adequately litigated and addressed before the PTO.

Turning to the prosecution history, when plaintiff's continuation application was filed, it claimed "at least one covered vertical channel extending longitudinally along the length of the front or back wall with openings on opposite ends and molded into the front wall or back wall." (DE 8-8

at 9).  On June 29, 2017, this claim was rejected by the examiner because the language relating to a "covered" channel was indefinite.  (DE 30-9 at 6 ("There is nothing disclosed that distinguishes a channel from a covered channel . . . .").  Following an interview with the examiner, it was agreed that this rejection would be overcome by amending the claims to describe the covering over the channel as being "formed by a recessed area in the interior surface of the front and/or back walls." (DE 30-10 at 2-3).  On August 25, 2017, the claims were amended to reflect the language that is currently included in claim 1 of the '210 Patent, which include "at least one covered recessed vertical channel molded into the interior surface of the front or back wall . . . ." (DE 30-11 at 3; '210 patent (DE 8-9) col. 4 ll. 36-37).

Here, the examiner found, and the court agrees, that the patent when read in light of the specification and the prosecution history sufficiently informs, with reasonable certainty, those skilled in the art as to the scope of the term "covered."  Therefore, defendant has not met its burden in raising a substantial question that the '210 patent is invalid as indefinite.

    3.    Irreparable Harm

"A party seeking a preliminary injunction must establish that it is likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm."  Metalcraft, 848 F.3d at 1368 (citing Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352, 1360 (Fed. Cir. 2013)).  Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm. Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012).  However, evidence of potential lost sales alone does not demonstrate irreparable harm.  Metalcraft, 848 F.3d at 1368 (citing Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006)).  Evidence

showing that no amount of monetary damages, however great, could address the harm tends to show it is an irreparable harm. Id. (citing Celsis in Vitro, 664 F.3d at 930).

Here, plaintiff alleges irreparable harm in the following ways: "(i) harm to brand loyalty which causes unquantifiable lost sales, lost customers and lost market share, (ii) harm to Edge-Works' status as an inventor, and, (iii) harm caused by the erosion of brand distinction and reputation." (DE 8 at 18). Additionally, plaintiff argues that "[t]he existence of irreparable harm is further evidenced by the fact that Edge-Works has been forced into direct competition with a product that embodies Edge-Works' own patented design." (Id.).

Turning first to plaintiff's argument as to harm to brand loyalty, although plaintiff offers multiple cases recognizing this type of harm, plaintiff offers insufficient evidence to support its position that it is likely to both suffer irreparable harm to brand loyalty without a preliminary injunction and that there is a causal nexus between the alleged infringement and the alleged harm.

First, the only evidence offered by plaintiff as to the existence of brand loyalty is unsupported affidavit evidence from plaintiff's president that consumers of tactical gear tend to remain loyal to one brand and 59% of plaintiff's customers are repeat customers. (DE 8-2 at 2). The court has no way to determine how plaintiff arrived at this 59% figure, how much of that figure is driven by sales of its magazine pouches, or how much of that figure could be impacted by defendant's allegedly infringing actions. Similarly, plaintiff does not state what percentage of its revenue comes from sales of its magazine pouches, stating only that magazine pouches account for a significant portion of plaintiff's accumulated sales and that the Scorpion products in general have grossed over a million dollars in sales. (Id. at 3, 7). However, the information provided does not allow the court to estimate the likely extent of plaintiff's injury relative to the size of the company

even taking into account the "snowball effect" discussed by plaintiff wherein each sale lost to a competitor implicates not just the revenue from that sale, but the revenue from many future sales of potentially multiple types of products.  (See DE 8 at 18).

Plaintiff also fails to provide evidence of the market at issue, stating only that defendant's release of its accused products will cause lost sales, customers, and market share, particularly in that defendant's release "coincide with the upcoming holiday season and the upcoming Shooting, Hunting, and Outdoor Trade Show" ("Shot Show") to be held in January in Las Vegas, Nevada. (DE 8-2 at 10).  Plaintiff makes no showing as to the extent of defendant's release and offers no evidence as to the potential impact on plaintiff's sales, customers, or market share.  In fact, plaintiff offers no evidence regarding its share of the market or how plaintiff's market is similar or different than defendant's market.[19]  Although "[d]irect competition in the same market is certainly one factor in suggesting strongly the potential for irreparable harm," Presidio Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012), evidence is needed to establish that direct competition in the same market is occurring, see id. ("Indeed the record shows direct and substantial competition between the parties. The trial court found that ATC and Presidio shared some of the same customers, that the two products occupy the same markets, and that Presidio was at times seen as ATC's only true competitor.").  Although the court recognizes that a showing of irreparable injury includes losses that are difficult to quantify, some factual showing must be made, and here, the court has little factual record on which to rule that irreparable harm to plaintiff's place in the market is likely.  See Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991)

---

[19] Defendant alleges that it partners with approximately 500 dealers to distribute its products in more than 200 countries on all seven continents.  (DE 21 at 4).  Defendant also alleges that plaintiff "sells its products primarily online, with few if any retail dealers or physical stores."  (DE 22 at 3-4).

("Further, neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.").

Plaintiff argues that plaintiff's evidence, that it has sold more than a million dollars worth of its Scorpion products, that its customer base has "tremendous brand loyalty, with 59% of its customers being repeat customers," and lost sales, lost customers, and lost market share will occur, "is exactly the type of evidence relied upon by recent courts to find irreparable harm." (DE 30 at 15 (citing Metalcraft, Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633 (Fed. Cir. 2015), and Veeco Instruments Inc. v. SGL Carbon, LLC, No. 17-CV-2217 (PKC), 2017 WL 5054711 (E.D.N.Y. Nov. 2, 2017)). Plaintiff is correct that the types of evidence it offers were relied upon by these courts, but plaintiff is incorrect that these cases stand for the proposition that unsupported assertions regarding these types of evidence is sufficient to find irreparable harm. See Apple, 809 F.3d at 641 (noting the district court found undisputed "Apple had lost market share and down stream sales to Samsung" and that the parties directly competed in the relevant market); Veeco, 2017 WL 5054711, at *27 (holding that the forms of irreparable harm asserted are cognizable for purposes of a preliminary injunction "if supported by sound evidence").[20]

Turning to allegations of harm to reputation, plaintiff must first demonstrate that it has a reputation that could be subject to damage. Plaintiff argues that it is "well-known as an innovator in the tactical gear industry," has been "granted several patents covering its Scorpion line of

---

[20] Regarding Metalcraft, it is unclear what evidence was relied upon by the trial court in making its determination, and the appellate case cited by plaintiff stands only for the proposition that "[t]here is no requirement that the district court discuss every fact alleged" in determining irreparable harm and that "the district court did not clearly err on this record" in determining that the damage to the movant "is irreparable because it is impossible to quantify the damages casued by the loss of a potentially lifelong customer." Metalcraft, 848 F.3d at 1368–69.

products," (DE 8 at 20), and offers in support of this position an article from 2002 describing plaintiff as the "most innovative of the bunch" of kydex holster makers, (DE 8-3) and to a more recent article describing the launch of plaintiff's Scorpion line of pouches which includes comments by readers such as "Scott and his crew run a truly first class operation - they put lots of thought and operator input behind everything they do and this looks like it's going to be (yet another) winner from them," (DE 8-5). The court finds plaintiff has offered sufficient evidence of a "reputation as an innovator."

However, plaintiff must still demonstrate that it will likely suffers irreparable reputation harm absent an injunction, and that there is a causal nexus between that harm and defendant's infringement. See Apple, 809 F.3d at 640 ("The causal nexus requirement ensures that an injunction is only entered against a defendant on account of a harm resulting from the defendant's wrongful conduct, not some other reason."). In support of its contention of harm, plaintiff argues that defendant's "advertisements and promotions surrounding its infringing Polymer Taco suggest that it is HSG, not Edge-Works, who is the innovator." (DE 8 at 20-21). In addition to the articles cited above, plaintiff cites to defendant's website which states plaintiff's Polymer Taco is patented, (DE 8-11 ("[o]ur patented line of polymer TACOs® function much the same as their nylon counterparts")),[21] and to a Solder System's article stating defendant's Polymer Taco "revolutionizes" the magazine carrier market, (DE 8-12).

Of significance are the comments made in response to the online articles by consumers

---

[21] Plaintiff argues that although defendant advertises otherwise, plaintiff has been unable to find, and defendant has not disclosed, a patent held by defendant that covers its Polymer Taco. (See, e.g., DE 8 at 10-11). Defendant disagrees, arguing that the PTO "has recognized HSG as an innovator in the field, issuing a patent that covers the Accused Products." (DE 21 at 24 (citing U.S. patent no. 9,759,536 (DE 22-1) issued September 12, 2017)). The issue as to whether defendant's patent covers its accused products is not currently before the court and therefore will not be resolved by the court at this time.

indicating that consumers, although not confused by who made which product, believe either plaintiff or defendant or both are engaged in copying the other's products and have been for some time.  (See DE 8-5 at 4 ("And I think HSGI might be raising a eye brow or two. Any body say Kydex taco."); id. at 5 ("I think it's the shock cord that makes me think of it, because 'Kydex TACO" was the first thought I had as well"); id. at 10 ("I can't deny that 'TACO' popped in to my head on first sight, but that's not say these will function the same."); DE 8-12 at 5 ("Wait . . . what? So now HSGI is copying G-Code's copy of HSGI's original design . . . .?"; id. at 6 ("HSGI junk . . . . Way to come in second once again.")).

The court finds that although plaintiff has provided some evidence of harm, it has not provided sufficient evidence that it will likely suffer irreparable harm to its reputation as an innovator absent an injunction or that there is a causal nexus between that harm and defendant's infringement.  The evidence shows that the parties' disagreement as to who is the innovator in the field and who has copied which product is an ongoing debate that did not begin with the release of defendant's accused products.  (See, e.g., DE 8-12 at 5 ("Actually, the fact is G Code was the co-inventor and assisted Gene with the development of the 'Taco' about eight years ago.  So who is copying who?").[22]

In coming to this conclusion, the court recognizes the analysis provided by the Federal Circuit in Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1344–45 (Fed. Cir. 2013). There the court held that the district court "made a clear error in judgment in its analysis" of reputation loss, holding that although there was no evidence that interested consumers confused the

---

[22] Defendant references this ongoing dispute, stating in its brief that, "[i]n an ironic twist, Edge-Works now accuses HSG of infringing Edge-Works so-called 'inventions,' which are simply its copy of HSG's famous TACO." (DE 21 at 6).

two companies, harm could still occur, "particularly its perception in the marketplace by customers, dealers, and distributors," where, for example, 1) "customers found the same 'innovations' appearing in" products of the competitors, "particularly products considered less prestigious and innovative"; 2) where defendant's expert agreed that plaintiff's reputation would be damaged if the industry believed plaintiff "did not enforce its intellectual property rights"; 3) where the evidence showed plaintiff intentionally never licensed its patents to maintain market exclusivity.  Id.

First, although it appears customers may find the same "innovations" appearing in both plaintiff's and defendant's products, as evidenced by the comments found on the websites submitted by plaintiff, no evidence has been provided that defendant's products are considered less prestigious and innovative.  Second, plaintiff argues, but provides no evidence, that the industry will believe plaintiff does not enforce its intellectual property rights absent an injunction, but the court finds this argument insufficient.  This allegation, without more support, applies to every patent case where a patentee seeks a preliminary injunction against a competitor.[23]  Third, no evidence has been provided that plaintiff intentionally never licensed its patents to maintain market exclusivity.

The Douglas court also stated that "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."  Id.  As previously stated, although it appears clear that the parties are in competition with each other, plaintiff has offered no evidence in support of the extent of that competition in order for the court to determine irreparable

---

[23]  For a similar reason, the court rejects plaintiff's unsupported argument that defendant's infringement has caused plaintiff to lose brand distinctiveness in that "HSG is Edge-Works' only competitor to have implemented its version of Edge-Works' channel system."  (DE 8 at 22).  Like plaintiff's argument concerning enforcement of its intellectual property rights, this argument applies to many patent case where a patentee seeks a preliminary injunction against a competitor.  Factual support is needed beyond the argument that defendant and only defendant has sold allegedly infringing products such as evidence that the parties are direct competitors or other evidence that would allow the court to infer loss of brand distinctiveness.

harm is likely to occur or that monetary damages are inadequate, thereby justifying the remedy of a preliminary injunction.

Therefore, this court concludes that plaintiff has failed to carry its burden that it has suffered irreparable harm, as necessary to justify the imposition of the extraordinary relief of a preliminary injunction. Because the court finds that plaintiff cannot establish <u>both</u> likelihood of success <u>and</u> irreparable harm, plaintiff cannot be granted a preliminary injunction, and it is unnecessary for the court to analyze the balance of hardships and the impact of a potential injunction on the public interest. See <u>Polymer Technologies, Inc. v. Bridwell</u>, 103 F.3d 970, 973–74 (Fed. Cir.1996) ("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors.").[24]

## CONCLUSION

For the above stated findings of fact and conclusions of law, plaintiff's motion for a preliminary injunction is DENIED.

SO ORDERED, this the 11th day of January, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge

---

[24] Because plaintiff has filed with the court its November 13, 2017, confirmatory patent assignment which assigns the '210 patent and all related patent right from Evans to Edge-Works (<u>see</u> DE 30-3), confirmation of the recording of the assignment document with the PTO (<u>see</u> DE 30-4), and affidavit of service showing plaintiff personally served defendant with paper copies of the summons and complaint (<u>see</u> DE 27), it is unnecessary for the court to address defendant's arguments concerning these issues.